In the

# United States Court of Appeals
## For the Seventh Circuit

No. 25-3164

SHANNON GOLAT,

*Plaintiff-Appellant,*

*v.*

HONORABLE AUDREY K. SKWIERAWSKI, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:23-cv-00719 — **James D. Peterson**, *Chief Judge.*

ARGUED MAY 22, 2026 — DECIDED AUGUST 4, 2026

Before EASTERBROOK, RIPPLE, and PRYOR, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Shannon Golat was a court reporter for a judge in the state court of Rusk County, Wisconsin. Ms. Golat alleged in her complaint that, during her employment, she was subjected to a hostile work environment because of her sex. She also alleged that her employer failed to accommodate her disability. She further alleged that the defendants retaliated against her for complaining about the hostile work environment and for seeking reasonable

accommodation. Ms. Golat brought claims under Title VII, under 42 U.S.C. § 1983 for violation of the Equal Protection Clause, and under the Rehabilitation Act. She named as defendants Director of State Courts Audrey K. Skwierawski, Judge Steven Anderson, and several other individuals who worked within the court system. The district court granted summary judgment to the defendants on all counts. For the reasons set forth in this opinion, we now affirm the judgment of the district court.

## I

## BACKGROUND

Ms. Golat began working as a court reporter for Judge Fred Henderson in Rusk County, Wisconsin in 2007. In 2010, Judge Anderson replaced Judge Henderson and retained Ms. Golat as his court reporter. Ms. Golat's complaint raises a wide range of conduct involving multiple individuals between 2017 and the end of her employment with Rusk County in 2022.

Ms. Golat's complaint sets forth in some detail her on-going interactions with two individuals. Sharon Lee was Judge Anderson's judicial assistant in 2017 and 2018. Lee and Judge Anderson knew each other before she came to work for him. According to the complaint, shortly after Lee started her employment, she refused to perform judicial assistant job functions that related to Ms. Golat. Specifically, Ms. Golat no longer received her mail and no longer received Judge Anderson's calendar. Additionally, Ms. Golat's name no longer appeared on the court's letterhead. The complaint also recites that Lee made disparaging comments about Ms. Golat to others. Specifically, she made comments about Ms. Golat's body

(especially her breasts) and clothing. Ms. Golat explained to the district court that "the animosity between Golat and Lee stemmed from Lee's dislike of Golat's family."[1]

Ms. Golat reported Lee's conduct to human resources and to Judge Anderson. At a meeting with Judge Anderson and Don Harper, the district court administrator at the time, Ms. Golat discussed her complaints. Judge Anderson admitted that Lee created "irritation" in the office, but he responded that "Sharon is Sharon."[2] As a result of the meeting, Lee no longer had formal responsibility for Ms. Golat receiving her mail or the Judge's calendar. Lee left her position at the end of 2018. After Lee left, her replacement still did not handle Ms. Golat's mail or let her review Judge Anderson's calendar.

Ms. Golat also alleges that Judge Anderson made sexist comments to her. According to Ms. Golat, Judge Anderson joked that Ms. Golat must be a lesbian because she drove a Subaru. Judge Anderson also told her that she was a "typical woman" who "nag[ged]" him when she complained about Lee's conduct.[3] At one point, Judge Anderson told her that she was like a "junior high school girl," and asked her if she was going to go back to her office and cry.[4] Ms. Golat alleges that Judge Anderson told her that he had a large penis, that he could sleep with any woman in the county, and made jokes

---

[1] R.146 at 8.

[2] R.95 at 78:21–79:16.

[3] R.99 at 8:15–20.

[4] *Id.* at 12:04.

about a condom factory.[5] Judge Anderson also used a mug in the courtroom that was decorated with cartoon imagery of male genitalia and had the words "hung jury" printed on it.[6] Ms. Golat testified that she reported this conduct in 2018 to Mr. Harper.

Ms. Golat also alleges that others made sexist comments in Judge Anderson's presence. She testified that a court security officer joked about her physical appearance. Ms. Golat also asserts that, after a hearing, an attorney and friend of Judge Anderson told her that she was attractive. Ms. Golat alleges that Judge Anderson was present when both the court security officer and the attorney made these comments. She reported these incidents to Chris Channing, a district court administrator.

In November of 2018, Ms. Golat injured her elbow during a fall at work. The injury required two surgeries, which took place in May 2019. While she was on medical leave, Judge Anderson, Deputy Director Caitlin Frederick, Chief Judge Maureen Boyle, and Interim District Court Administrator Greg Moore discussed whether to terminate Ms. Golat. Mr. Moore's meeting notes recorded that there were "some [questions] about her med leave & work product" and that Ms. Golat was "nasty, rude, and mean."[7] Chief Judge Boyle also expressed skepticism about the legitimacy of Ms. Golat's

---

[5] The only evidence of these comments is Ms. Golat's sworn EEOC charge. The district court disregarded these comments as unsupported by evidence, which Ms. Golat argues was an error. She asserts that we should treat the EEOC charge as the evidentiary equivalent of a sworn affidavit.

[6] R.99 at 7:09–14.

[7] R.104 at 21; R.94-33 at *1–2.

medical leave, stating that the medical records appeared to be altered. Chief Judge Boyle stated that she wanted to terminate Ms. Golat. In September of 2019, however, Judge Anderson, Ms. Frederick, and Rusk County Clerk of Court Lori Gorsegner decided not to terminate Ms. Golat. Instead, "[t]he consensus was to allow the situation to play out for a little [bit] longer."[8]

Ms. Golat returned from medical leave in August 2019. She was medically restricted from working more than three days each week and could type for only a limited time each day. Judge Anderson instructed Ms. Golat that if she needed any time off for medical appointments, she needed to take a full day off. Judge Anderson admits that he made this request and explained that it was easier to find a substitute court reporter for a full day than for a few hours. Judge Anderson also moved Ms. Golat's office, telling her that the courthouse needed her previous office for a conference room. Ms. Golat asserts that the space was never converted to a conference room.

Around the same time, the courthouse adopted a digital audio recording (DAR) system, which recorded hearings so that they could be transcribed later. The court sometimes used the DAR system when there was no court reporter available. Ms. Golat complained openly about being assigned to transcribe recordings made by the DAR system. At one point, Ms. Golat requested help with six DAR transcripts from the district court administrator. The district court administrator denied the request because he believed that it was motivated by Ms. Golat's dislike of the DAR system rather than by

---

[8] R.94-62.

genuine need. The same administrator later approved assistance for Ms. Golat with other transcripts.

Starting in 2021, Ms. Golat was the subject of multiple disciplinary inquiries. First, in December, at Judge Anderson's request, the administrator investigated her travel reimbursement submissions and issued a reprimand. The reprimand asked her to correct deficiencies in her travel reimbursement requests. Ms. Golat eventually discovered that the administrator had used the wrong address to calculate the travel expenses, which accounted for the discrepancies. The complaint was pursued no further, but Ms. Golat was never notified that it was rescinded.

The second inquiry arose when a package containing a vacuum went missing. Three packages, which were addressed to the district attorney, were left outside of Ms. Golat's office. Ms. Golat called the district attorney's office to notify it of the delivery, and an employee of that office retrieved two of the three boxes. The third box contained a vacuum. Ms. Golat removed the vacuum from its box, recycled the box, and left the vacuum in her office. The next day, Ms. Golat announced on a Zoom call (which included members of the district attorney's office) that she had the vacuum, but no one heard her. Unable to find the missing vacuum, the Director of State Courts initiated its own investigation, and a paralegal from the district attorney's office contacted the police. After a few days, the vacuum was found in a conference room adjacent to Ms. Golat's office.

Melissa Bohse, a human resources officer, produced a memorandum that recommended that Ms. Golat be suspended on account of the missing vacuum. Notably, this memorandum was completed just two days after

Ms. Frederick, and, presumably, the Director of State Courts, became aware of Ms. Golat's EEOC charge, which was filed in March 2022. The memorandum concluded that, while the court could not definitively prove whether Ms. Golat had attempted to steal the vacuum, it had proof that Ms. Golat had lied to employees of the court and the district attorney about her handling of the boxes, and that she had failed to respond to email communications attempting to locate it.[9] The parallel police report also was inconclusive as to whether Ms. Golat attempted to steal the vacuum. Ms. Golat received a one-week suspension for lying in connection with the investigation on March 18.

Around the same time, a third disciplinary inquiry began when rumors surfaced that Ms. Golat had accepted credit from a salon owner in lieu of cash in exchange for a transcript. Ms. Golat admitted that this allegation was true. Ms. Golat was placed on paid administrative leave and received a written reprimand for creating a conflict of interest by soliciting gifts in exchange for court-related duties.

Finally, in this same period, Ms. Golat was investigated for contacting outside of court the family members of a victim in a homicide case before Judge Anderson. Ms. Golat admitted in her deposition that she contacted Frank and Brigette Rosolowski in late 2021, but the content of the call is disputed. Ms. Golat alleges that she asked Brigette Rosolowski whether she could be a witness to her upcoming EEOC proceedings;

---

[9] Crystal Cleveland, a paralegal for the district attorney, told Melissa Bohse, the court's human resources officer, that Ms. Golat claimed that there were only two boxes delivered. Nancy Hahn, who also worked in the DA's officer, told Bohse that Ms. Golat also told her that there were only two boxes delivered.

Ms. Golat thought she had heard Judge Anderson make a disparaging comment about Ms. Golat.[10] The defendants assert that Ms. Golat offered to give the Rosolowskis a recording of Judge Anderson saying something negative about Frank. Then-District Attorney Annette Barna testified that Brigette Rosolowski called her "crying hysterically" and asking if Judge Anderson's opinion of Frank would permit him to be fair in the homicide case.[11] Judge Anderson ultimately recused himself from the homicide case because of Ms. Golat's conversation with Brigette Rosolowski. Ms. Golat was reprimanded for undermining confidence in the court system, using confidential information for personal purposes, and failing to follow internal complaint procedures.

On July 29, 2022, Judge Anderson retired. He was replaced by Judge Barna. Court reporters are personal appointees of specific judges, so Ms. Golat's job ended when Judge Anderson retired. The custom in the County was for new judges to rehire the predecessor's court reporter, but this practice was not required. Judge Barna did not rehire Ms. Golat. She testified that she decided not to rehire Ms. Golat because of her employee record, the Rosolowski matter, and her knowledge that other judges refused to allow Ms. Golat to work in their courtrooms.[12] Chief Judge Boyle, who had previously

---

[10] These comments allegedly were made in an unrelated family law case that also involved the Rosolowskis.

[11] R.101 at 111:02–06.

[12] Judge John Anderson, a Bayfield County judge, did not allow Ms. Golat to cover his court room because he had observed her being abusive toward his staff and complaining about the DAR system.

expressed an interest in firing Ms. Golat, also "strongly urged Judge Barna not to appoint Golat."[13]

Another judge, Judge Angeline Winton, expressed interest in hiring Ms. Golat. Mr. Channing recommended to Judge Winton that she review Ms. Golat's personnel file before hiring her. Judge Winton followed Mr. Channing's advice. After reviewing the personnel file, she decided not to hire Ms. Golat.

## II

## DISCUSSION

Ms. Golat's second amended complaint included four counts against Audrey K. Skwierawski in her official capacity as the Director of State Courts,[14] Christopher Channing, Caitlin Frederick, Melissa Bohse, Judge Annette Barna, Judge Steven Anderson, and Judge Randy R. Koschnick.[15] Against all defendants, Ms. Golat alleged a hostile work environment on the basis of sex in violation of 42 U.S.C. § 2000e (Count I) and retaliation in violation of 42 U.S.C. § 2000e (Count II). Against

---

[13] R.124 at ¶ 18.

[14] The "Wisconsin State Court System" was originally named as a defendant, but it was determined that there is no such juridical entity. The Director of State Courts is the "chief nonjudicial officer of the court system in the state." Wis. Sup. Ct. R. 70.01(1). It functions as an agency or office under Wisconsin state law, receiving appropriations from the state legislature that it uses to run the operations of the state court system. Wis. Stat. § 16.70(1e). Ms. Golat was permitted to substitute the Director of State Courts for the "Wisconsin State Court System" under 28 U.S.C. § 1653 and Federal Rule of Appellate Procedure 43(b).

[15] Ms. Golat stipulated to the dismissal of Judge Barna and Judge Koschnick before summary judgment motions were filed.

the Director of State Courts, she alleged a violation of the Re-habilitation Act, 29 U.S.C. § 701 *et seq.*, (Count III). Against Judge Koschnick, Judge Barna, Judge Anderson, Mr. Chan-ning, Ms. Frederick, and Ms. Bohse, she alleged deprivation of equal protection in violation of 42 U.S.C. § 1983 (Count IV). On cross motions for summary judgment, the district court granted summary judgment for the defendants.

We review the district court's grant of summary judgment de novo and view all evidence in the light most favorable to the nonmoving party.[16] We review the district court's eviden-tiary decisions for abuse of discretion.[17]

## A

Ms. Golat alleged that Judge Anderson created a hostile work environment on the basis of sex through his own com-ments and actions and by tolerating the comments and ac-tions of those within his control, including lawyers and court staff. She alleged that HR personnel and the Director of State Courts were made aware of this conduct through her com-plaints but did nothing.

The district court identified eleven actions and comments that formed the basis of Ms. Golat's hostile work environment claim. It held that the comments and actions by Sharon Lee could not support the claim because Ms. Golat had under-mined any inference that her sex caused that conduct by stat-ing in her response brief that Lee's animosity toward Ms. Go-lat was tied to a family feud. The court also concluded that there was no causal connection between Ms. Golat's sex and

---

[16] *Fabick, Inc. v. JFTCO, Inc.*, 944 F.3d 649, 658 (7th Cir. 2019).

[17] *James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020).

the disciplinary actions against her because there was no evidence that the decisionmakers were motivated by her sex. It supported this conclusion by pointing to the fact that Ms. Golat admitted many of the violations. Finally, the court found that Judge Anderson's own comments were jokes, lacked the requisite severity, and were made too sporadically over a five-year period.

**1**

To support a Title VII hostile work environment claim, Ms. Golat must show "(1) she was subjected to unwelcome conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer liability." *Roby v. CWI, Inc.*, 579 F.3d 779, 784 (7th Cir. 2009). Ms. Golat admitted that Lee's behavior was motivated by personal animosity. Similarly, there is no evidence whatsoever that the various disciplinary investigations into Ms. Golat were motivated by her sex. Judge Anderson's alleged comments that Ms. Golat was faking her elbow injury also have no apparent connection to Ms. Golat's sex. That being said, many of the comments made by Judge Anderson and in his presence by court staff and attorneys were clearly based on Ms. Golat's sex. When comments are "sex-specific and derogatory" and are directed toward a female victim, a reasonable jury can conclude that they were made because of the plaintiff's sex. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Judge Anderson allegedly joked about Ms. Golat being a lesbian; told her that she behaved like a "junior high school girl"; told her that she "nag[s]" like a "typical woman"; asked her if she was going back to her office to cry; used a mug printed with images of

male genitalia and the words "hung jury"; told Ms. Golat that he could sleep with any woman in the county; made jokes about a condom factory; and told Ms. Golat that he had a large penis.[18] Additionally, in Judge Anderson's presence, a court security officer joked about her physical appearance and an attorney told Ms. Golat that he found her attractive.

Ultimately, Ms. Golat's claims fail because the alleged conduct is not objectively "severe or pervasive." To be actionable under Title VII, conduct must be "sufficiently severe or pervasive to alter the conditions of employment such that it creates an abusive working environment." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). Objective severity is not a "mathematically precise" standard, and it "depends on all of the circumstances." *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018) (citation modified). Additionally, the analysis of severity frequently overlaps with and is influenced by the analysis of other elements, including the pervasiveness of the comments. In spite of this capacious

---

[18] The last three comments in this list are supported only by the EEOC charge, and the district court disregarded them for that reason. We have not addressed this issue, but the Fifth Circuit has held that the EEOC charge itself is competent evidence at summary judgment if it is not otherwise inadmissible under the Federal Rules of Evidence. *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 701 (5th Cir. 2014). We find its reasoning compelling. EEOC charges are analogous to verified complaints, which are also signed, sworn, and submitted under penalty of perjury. Verified complaints are treated as affidavits for summary judgment purposes. *James*, 959 F.3d at 314. Verified complaints must comply with 28 U.S.C. § 1746, which requires that the declarant use specific language: "I declare … under penalty of perjury that the foregoing is true and correct." The language in the EEOC charge is substantially similar, stating: "I declare under penalty of perjury that the above is true and correct." R.94-26. Given these similarities, we will treat the EEOC charge as an affidavit.

description, "we must be careful not to substitute judicial pre-
dilections for jury determinations." *Sanchez v. El Milagro, Inc.*,
176 F.4th 961, 969 (7th Cir. 2026). We find it helpful, therefore,
to review first the principles that can be distilled from cases
discussing objective severity.

First, and most obviously, comments that are perceived as
threats, expressions of sexual interest, sexual advances, or
comments that are demeaning or embarrassing, are more
likely to be severe.[19] However, conduct does not need to be
overtly sexual to be actionable. *Costco Wholesale Corp.*, 903 F.3d
at 626 ("[I]t need not consist of pressure for sex, intimate
touching, or a barrage of deeply offensive sexual com-
ments.").

Second, comments that can be characterized as jokes or
"vulgar banter" are less likely to be severe. *Baskerville v. Cul-
ligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (citing *Meritor
Savings Bank v. Vinson*, 477 U.S. 57, 61 (1986)); *Adusumilli v.
City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998) (holding that
"teasing about waving at squad cars, ambiguous comments
about bananas, rubber bands, and low-neck tops, staring and

---

[19] *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 841 (7th Cir. 2009); *Hostetler v.
Quality Dining, Inc.*, 218 F.3d 798, 807–09 (7th Cir. 2000) (holding that a
lewd proposition, combined with an unwelcome kiss and attempt to re-
move a bra was clearly sufficient because of their "physical, intimate, and
forcible character"); *Orton-Bell v. Indiana*, 759 F.3d 768, 775 (7th Cir. 2014)
(holding that comments from a supervisor that "her ass looked so good
that it would cause a riot" and sexual comments from male employees
while she was being patted down to enter the prison were severe). *But see
Bohen v. City of East Chicago*, 799 F.2d 1180, 1186 (7th Cir. 1986) (distin-
guishing harassment from "a single, innocent, romantic solicitation which
inadvertently causes offense" (quoting *Skadegaard v. Farrell*, 578 F. Supp.
1209, 1217 (D.N.J. 1984))).

attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks" was not severe).

Third, the court should consider the target of the comments. Comments directed at someone other than the plaintiff, or at a group of people that simply includes the plaintiff, are less likely to be severe than comments made directly and exclusively to the plaintiff. *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004); *Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001); *but cf. Yuknis v. First Student, Inc.*, 481 F.3d 552, 554 (7th Cir. 2007) (explaining that the line between direct and second-hand harassment is "quite a fine one").

Finally, in addition to examining the comments themselves, the court should consider the professional and personal relationship between the speaker and the plaintiff. Comments uttered by a supervisor are more likely to be severe than comments uttered by a co-worker. *See Gates v. Bd. of Educ. of the City of Chic.*, 916 F.3d 631, 638 (7th Cir. 2019). The severity is proportional to how directly the supervisor controls the plaintiff; a direct supervisor's comments are more serious than an indirect supervisor's comments. *EEOC v. Vill. at Hamilton Pointe LLC*, 102 F.4th 387, 402 (7th Cir. 2024).

The nature and quality of the personal relationship between the plaintiff and the speaker is also relevant; a former romantic relationship or a hostile relationship can "shed light on … whether the complained-of conduct was unwelcome, whether it resulted in a workplace that the harassee subjectively experienced as hostile, and whether it occurred because of the harassee's sex." *Turner v. Saloon, Ltd.*, 595 F.3d 679, 686–87 (7th Cir. 2010) (quoting *Ammons-Lewis v. Metro. Water*

*Reclamation Dist. of Greater Chi.*, 488 F.3d 739, 746–47 (7th Cir. 2007)); *see also Costco Wholesale Corp.*, 903 F.3d at 624–27 (holding that non-sexual comments and touching were severe because they took place in the context of the harasser stalking the plaintiff). However, a prior sexual relationship with the harasser is "by no means dispositive" because "'[a] person's private and consensual sexual activities do not constitute a waiver of his or her legal protections against unwelcome and unsolicited sexual harassment' at work." *Ammons-Lewis*, 488 F.3d at 746 (citing *Johnson v. West*, 218 F.3d 725, 729–30 (7th Cir. 2000), and quoting *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1001 (10th Cir. 1996)). By considering these specific factors, courts can eliminate the temptation to decide based on a gut reaction to the comments, which is more likely to be infected by personal bias.

Although these incidents were unprofessional, rude, and offensive, it is undisputed that the conduct here was not threatening and that Ms. Golat did not construe them as sexual advances. Nor did she have a personal relationship with Judge Anderson that would suggest that they would be perceived as such. On the other hand, Judge Anderson held a position of power, not only as a judge, but also as the sole individual responsible for Ms. Golat's hiring and firing. She served at his pleasure, which certainly increases the seriousness of his comments. *See Vill. at Hamilton Pointe*, 102 F.4th at 402.

However, some of the conduct (like the mug) was not directed exclusively at Ms. Golat, and the rest of the conduct cannot be characterized as more than the "occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers," which is not enough. *Baskerville*, 50 F.3d at 430.

**2**

The conduct does not have to be both severe *and* pervasive, so a "relentless pattern of lesser harassment can be sufficient to meet the standard." *Vill. at Hamilton Pointe*, 102 F.4th at 402 (citation modified). While there is no "magic number" of incidents that is required to establish a hostile work environment, *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000) (citation modified), the comments here are too sporadic to support liability. Judge Anderson made approximately six sexist or sexual comments directly to Ms. Golat over a five-year period. Court staff made comments to Ms. Golat twice during the same period. The mug was present in the courtroom for an unspecified period of time. While this is more than a single isolated incident, it does not rise to the level of a "relentless pattern." *Vill. at Hamilton Pointe*, 102 F.4th at 402 (citation modified); *see Scruggs*, 587 F.3d at 841 (holding that multiple similar comments over the course of one year were not enough); *Patt v. Family Health Systems, Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (holding that two comments made directly to the plaintiff over seven years were not enough). Ms. Golat has pointed to no cases in which conduct of this severity and frequency supported a hostile work environment claim. There was no error in granting summary judgment on Ms. Golat's Title VII claim and Equal Protection claim.[20]

---

[20] Because Ms. Golat cannot prove a violation of her constitutional right against gender discrimination, summary judgment on her § 1983 claim under the Equal Protection clause was also proper.

**B**

Ms. Golat next submits that the defendants failed to rea-
sonably accommodate her after she experienced a fall at work
that restricted her ability to type. She challenged her office
move, the imposition of the DAR system, the full-day sick
leave requirement and the district court administrator's de-
nial of requests for assistance with transcripts. She also as-
serted that negative comments about her disability made by
Judge Anderson and others supported her claims.

The district court concluded that the evidence did not
demonstrate a failure to accommodate in violation of the Re-
habilitation Act. First, Ms. Golat's office move was not a fail-
ure to accommodate because there was no evidence that she
needed her original office location to do her job in light of her
disability. Second, defendants' negative comments about her
disability were not relevant to an accommodation claim.[21]
Third, the court concluded that requiring Ms. Golat to com-
plete transcripts from the DAR system was a reasonable ac-
commodation because it allowed her to continue to work
while she was unable to type for a full day. Fourth, the court
found that requiring Ms. Golat to take full days off for short
medical appointments was reasonable because it was undis-
puted that the defendants could more easily find a substitute
court reporter for a full day. Additionally, the court deter-
mined evidence that the defendants had previously allowed
Ms. Golat to take partial days off was not dispositive because

---

[21] The court noted earlier in its order that Ms. Golat attempted for the first
time in the litigation to frame her hostile work environment claim as one
based on disability. The court did not evaluate this claim because Ms. Go-
lat failed to give notice of it in her Second Amended Complaint. Ms. Golat
does not challenge this ruling.

that dispensation was more than the law required. Fifth and finally, the court found that Ms. Golat's claim that she was prohibited from requesting help was not supported by the evidence. The court found that the undisputed evidence showed that Ms. Golat's requests for help were granted until Mr. Channing determined that she was requesting help only with DAR transcripts, which he took to reflect a preference rather than a disability-based need.

To establish a failure to accommodate claim, Ms. Golat must show that: "(1) she is a qualified individual with a disability; (2) the defendant was aware of her disability; and (3) the defendant failed to reasonably accommodate her disability." *Gratzl v. Off. of the Chief Judges of the 12th, 18th, 19th & 22nd Jud. Cirs.*, 601 F.3d 674, 678 (7th Cir. 2010) (citation modified). To be a qualified individual with a disability, Ms. Golat must be able to complete her essential job functions with or without a reasonable accommodation. *Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002). A reasonable accommodation is one that allows the employee to complete the essential functions of the job in reasonable comfort. *Bourke v. Collins*, 142 F.4th 918, 921 (7th Cir. 2025). The employer is not required to provide the employee with their preferred accommodation. *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000). An employer is also not required to create a new job to accommodate a disabled employee. *Conners v. Wilkie*, 984 F.3d 1255, 1262 (7th Cir. 2021). Nor is an employer required to "shuffle job responsibilities amongst employees" to accommodate the employee. *Jay*, 223 F.3d at 1017.

Ms. Golat submits that the Director of State Courts failed to reasonably accommodate her in multiple instances: by requiring her to take full-day sick leave for medical

appointments, by moving her office, by requiring her to use the DAR system, and by denying her help with completing her transcripts.

Ms. Golat submits that it was not a reasonable accommodation to require her to take full-day sick leave when she needed to leave for one- or two-hour medical appointments. The policy required her to use paid sick leave that she had accrued through years of work. Her chief complaint is that she should not have been required to use more of her reserve sick leave than was necessary. The Director of State Courts, for its part, presented evidence that it could not reasonably accommodate partial sick days because it was too difficult to find substitute stenographic court reporters for less than a full day.

We have held that an employer does not violate the Rehabilitation Act when it requires an employee to use their sick leave. *Smithson v. Austin*, 86 F.4th 815, 822 (7th Cir. 2023); *see also Yochim v. Carson*, 935 F.3d 586, 591 (7th Cir. 2019) (holding that an offer of generous sick leave approval could not be inadequate). Indeed, "[t]he very purpose of sick leave is to accommodate employees who are unable to work due to illness." *Smithson*, 86 F.4th at 822. Still, Ms. Golat's complaint differs from such cases, because she does not insist that she should have been permitted to miss work without using her sick leave, but rather, that she should not have been required to miss work, and consequently, use too much of her leave.[22]

---

[22] These arguments are quite similar to those raised in *Vande Zande v. State of Wisconsin Department of Administration*, 44 F.3d 538 (7th Cir. 1995). In that case, the employee requested as an accommodation permission to work from home. *Id.* at 544. Her employer allowed her to work from home for part of the relevant period but required her to use her sick leave for the rest. Like Ms. Golat, "she incurred no loss of income, but did lose sick

Ultimately, Ms. Golat has not put forth any evidence by which a jury could find in her favor. The Director of State Courts, through a declaration from Judge Anderson, asserts that it could not reasonably accommodate partial day sick leave. She asks that we permit a jury to evaluate the credibility of Judge Anderson's declaration without any evidence to the contrary. Ms. Golat asserts only that the prior practice of her employer—allowing partial day sick leave—would permit a jury to infer that this was in fact a reasonable accommodation. But prior practice alone cannot support such an inference. *See Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995). In certain circumstances, having multiple court reporters cycle through the courtroom in a single day could be quite disruptive to proceedings. It is also not difficult to see that substitute court reporters may turn down requests for one or two hours of work in the hope that they might receive a full-day assignment elsewhere. A court's willingness and ability to deal with such difficulty in the past does not establish that it could do so on another occasion. Without some evidence showing that Judge Anderson's estimation of staffing needs was a fabrication, a reasonable jury could not find that Judge Anderson's requirement that Ms. Golat use full-day sick leave to attend medical appointments was a failure to provide reasonable accommodation.

Ms. Golat also argues that the Director of State Courts failed to provide reasonable accommodation when it moved

---

leave that she could have carried forward indefinitely." *Id.* While our decision there turned significantly on the insufficiency of remote work technology at the time, we also noted that "[i]t [was] conjectural that she [would] ever need those 16.5 hours [of sick leave]; the expected cost of the loss must, therefore, surely be slight." *Id.* at 545.

her office because it was "treated as a demotion" and "reduced her access to hearings and diminished her status."[23] As the district court concluded, Ms. Golat has not claimed that she needed to retain her old office to complete her work in light of her disability. Since this action had no apparent connection to her injury or her ability to complete her work, it is not actionable as a failure to accommodate.

Next, Ms. Golat argues that the Director of State Courts failed to accommodate her by requiring her to transcribe from the DAR system. The DAR system recorded court hearings, which allowed her to transcribe those hearings asynchronously. Ms. Golat was medically restricted to working only three days a week and could only type for a short period each day. The DAR system was clearly a reasonable accommodation. It allowed her to continue to complete her job (making transcripts) while adhering to her medical restrictions. Ms. Golat never suggests an alternative accommodation, but even if she did, she is not entitled to her preferred accommodation. The DAR system permitted her to complete her regular job duties in reasonable comfort, and no reasonable jury could conclude otherwise on this record.

Ms. Golat's argument that the district court administrator's refusal to provide her help with her transcripts also fails. Employers are not required to reassign the essential functions of a position as an accommodation. *James v. Hyatt Regency Chi.*, 707 F.3d 775, 783 (7th Cir. 2013); *Peters*, 311 F.3d at 845–46. If Ms. Golat needed her essential work to be reassigned, that suggests that she could not perform her essential

---

[23] Appellant's Br. 40.

functions with any reasonable accommodation. *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 819 (7th Cir. 2004).

Ms. Golat argues that evidence of discriminatory intent supports the conclusion that the granted accommodations were unreasonable. Discriminatory intent is not an element of a failure to accommodate claim, but it can be relevant when the court considers whether the employer failed to engage in an interactive process. *Kinsella v. Baker Hughes Oilfield Operations, LLC*, 66 F.4th 1099, 1105 (7th Cir. 2023). But when the resulting accommodation is reasonable, a lack of process is not enough to prove a violation of the Act. *Conners*, 984 F.3d at 1262; *Sansone v. Brennan*, 917 F.3d 975, 980 (7th Cir. 2019). Ms. Golat has presented evidence that would permit a jury to find that there was no interactive process here, but because a reasonable accommodation was provided (the DAR system), that finding alone would not support liability. Accordingly, there was no error.

## C

Finally, Ms. Golat submits that she was retaliated against because of her protected activity in connection with the hostile work environment allegation and because of her requests for reasonable accommodations. She alleged that the retaliation took the form of investigations, disciplinary actions, and the eventual decision by Judge Barna not to rehire her.

The district court determined that only two of these actions could plausibly be materially adverse to Ms. Golat: Ms. Golat's suspension without pay for one week because of the vacuum incident; and the decision not to rehire Ms. Golat after Judge Anderson retired. The court found that no jury could find that the suspension was pretextual because there

was some evidence supporting the suspicion that Ms. Golat had stolen the vacuum, because the individual who escalated the issue to the police was an employee of the district attorney's office and therefore unaware of Ms. Golat's leave, and because there was not contemporaneous evidence that the individuals who decided to suspend her held animus against Ms. Golat.

As to the decision not to rehire Ms. Golat, the court found that it was not motivated by animus. Judge Barna was given Ms. Golat's personnel file, which included information about two serious charges to which Ms. Golat had admitted: she contacted the family members of a victim in an ongoing murder case before her judge and she had accepted salon credits as payment for court services. Accordingly, no jury could infer that the decision not to hire her was based on anything other than misconduct.

To establish a retaliation claim, Ms. Golat must show that "(1) [she] engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the two." *Estate of Harris v. City of Milwaukee*, 141 F.4th 858, 869 (7th Cir. 2025) (citation modified); *Fuller v. McDonough*, 84 F.4th 686, 690 (7th Cir. 2023).

**1**

It is undisputed that Ms. Golat engaged in protected activity, namely complaints of harassment to the district court administrators, requests for disability accommodations, and filing her EEOC charge. But Ms. Golat also argues that the district court erred by failing to recognize that her contact with the Rosolowskis was protected activity. She reasons that it was retaliatory to investigate and punish her for contacting

them because she did so for the purpose of gathering infor-
mation for an EEOC charge.

We cannot accept this contention. Title VII protects em-
ployees who "assisted [] or participated in any manner in an
investigation … *under this subchapter*." 42 U.S.C. § 2000e-3(a)
(emphasis added). It is undisputed that when Ms. Golat con-
tacted the Rosolowskis, she had not yet filed her EEOC
charge, and no official EEOC proceeding or investigation had
begun. *See Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 747 (7th
Cir. 2010). Further, Title VII does not insulate an employee
from being disciplined "for conduct that, if it occurred outside
an investigation, would warrant [discipline]." *Id.* at 745; *Benes
v. A.B. Data, Ltd.*, 724 F.3d 752, 753–54 (7th Cir. 2013) (holding
that barging into an EEOC mediation was not protected "par-
ticipation"). Accordingly, Ms. Golat's conversation with the
Rosolowskis does not qualify as protected activity.

**2**

Next, Ms. Golat argues that the district court erred by tak-
ing too narrow a view of what constitutes an adverse action.
"[U]nfair reprimands or negative performance evaluations,
unaccompanied by some tangible job consequence, do not
constitute adverse employment actions." *Grube v. Lau Indus.,
Inc.*, 257 F.3d 723, 729 (7th Cir. 2001). The travel reimburse-
ment audit never resulted in any discipline. The salon credit
investigation resulted in only a written warning, which does
not qualify as an adverse action. *Benuzzi v. Bd. of Educ. of City
of Chi.*, 647 F.3d 652, 665 (7th Cir. 2011). Contrary to Ms. Go-
lat's view, deviations from internal policy or practice, absent
a tangible job consequence, do not count as adverse actions.
Accordingly, the district court determined correctly that there
were only two employer actions that had tangible job

consequences: Ms. Golat's placement on unpaid administrative leave following the vacuum investigation; and the decision not to rehire Ms. Golat after Judge Anderson's retirement.

**3**

Having identified Ms. Golat's retaliation claims that involve legitimate protected activities and consequent adverse actions, we can now determine whether a reasonable jury could find that there was a but-for causal relationship between the two. *See Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 918 (7th Cir. 2022). In this context, "but-for" causation does not require that the protected activity be the only cause of the retaliatory action; it is enough that the action would not have occurred without the protected activity. *Id.* Ms. Golat can rely on circumstantial evidence, such as "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019) (quoting *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015)).

Ms. Golat's claim that she was suspended as retaliation fails because she cannot show that the stated reason for the discipline was pretextual. Showing pretext requires demonstrating "weaknesses, implausibility, inconsistencies, or contradictions" in the stated reason for the action. *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012). There is a factual dispute as to whether Ms. Golat intended to steal the vacuum, but she was not disciplined for stealing. She admits the conduct for which she was disciplined: she recycled the vacuum's box, stored the vacuum in the conference room, and failed to

respond to email inquiries about the location of the vacuum. Without evidence that her employer reached its conclusion that she violated policy in bad faith, she cannot establish pretext. *McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 799 (7th Cir. 1997); *Coleman*, 667 F.3d at 861; *see also Daugherty v. Wabash Ctr., Inc.*, 577 F.3d 747, 751 (7th Cir. 2009) (per curiam) (finding no FMLA retaliation claim when employee admitted to misconduct for which they were purportedly fired). Because Ms. Golat admits to the conduct, the undisputed evidence demonstrates a nonretaliatory reason for the action. Ms. Golat's claim therefore fails.

We turn next to the decisions of Judge Barna and Judge Winton not to hire Ms. Golat. Judge Barna testified that she decided not to hire Ms. Golat because of her employee record, the Rosolowski matter, and other judges' refusal to allow Ms. Golat to work in their courtrooms. She testified that she told Ms. Golat "that if any prospective judge would know that she was recording a judge without their knowledge off the record and going to victims in a double homicide case to stir up things, that she could bet she would never get a job as a court reporter again."[24] However, she also testified that she did not review Ms. Golat's employee record directly but relied on what she was told by others.

Judge Barna was still a district attorney during most of Ms. Golat's activity, and there is no evidence that the new judge harbored any animus toward Ms. Golat. Ms. Golat

---

[24] R.101 at 222:06–10. There is a factual dispute as to whether Ms. Golat recorded Judge Anderson. Whether Ms. Golat in fact engaged in this conduct is not relevant; the issue is whether Judge Barna believed she did. *See Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158–59 (7th Cir. 2014).

therefore points to Judge Boyle's involvement in the hiring decision. When Judge Barna was deciding whether to rehire Ms. Golat, Judge Boyle "strongly urged Judge Barna not to appoint Golat."[25] Recall also that Judge Boyle expressed skepticism about the legitimacy of Ms. Golat's disability and sexual harassment claims at a meeting in 2019 and suggested that Ms. Golat be terminated then. Although she does not name it as such, Ms. Golat relies on a "cat's paw" theory. Under that theory, when a biased supervisor with a retaliatory or discriminatory motive makes a recommendation that is the proximate cause of an adverse employment action, the biased supervisor's retaliatory or discriminatory motive is imputed to the decisionmaker. *See Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461 (7th Cir. 2021). Ms. Golat's claim could survive if she shows that Judge Boyle's recommendation to Judge Barna was the proximate cause of the rehire decision. *Id.* at 462. Proximate cause exists where the decisionmaker relied on the biased recommendation without determining if the adverse action was entirely justified apart from the recommendation. *Id.*; *Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2021) (ADEA retaliation). If the decisionmaker "is not wholly dependent" on the biased recommendation and instead "conducts her own investigation," the employer is not liable. *Sinha*, 995 F.3d at 574. Ms. Golat can make no such showing. True, Judge Barna relied to some extent on recommendations, but she also had personal experience with and knowledge of Ms. Golat, being particularly concerned with other judges' refusal to work with Ms. Golat and Ms. Golat's decision to contact the Rosolowskis outside of court. A rational jury could

---

[25] R.124 at ¶ 18.

not find that Judge Boyle's recommendation was the proximate cause of Judge Barna's decision.

Judge Winton also expressed an interest in hiring Ms. Golat after Judge Anderson retired. Mr. Channing recommended to Judge Winton that she review Ms. Golat's personnel file before hiring her. Mr. Channing was not involved in the 2019 meeting with Judge Boyle, and there is no evidence that he possessed a retaliatory animus. Further, Mr. Channing testified that he never received any direction from Judge Boyle as to what actions to take with regard to Ms. Golat.[26] Ms. Golat's personnel file was provided to Judge Winton, and included information about the vacuum incident, the salon credit incident, and the Rosolowski incident. After reviewing that information, Judge Winton chose not to hire Ms. Golat.

On this record, a rational jury could not find that Judge Winton's or Judge Barna's actions were proximately caused by the allegedly biased recommendations. Because Ms. Golat cannot establish causation, summary judgment was properly granted.

### Conclusion

The decision of the district court is affirmed.

AFFIRMED

---

[26] Mr. Channing testified that he only discussed Ms. Golat with Judge Boyle when "issues" arose. R.102 at 44:21–45:02, 47:05–13.